JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS
Clifford Torban

## DEFENDANTS
The Lincoln National Life Insurance Co.

**(b)**  County of Residence of First Listed Plaintiff    New Jersey
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Nebraska
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)**   Attorneys *(Firm Name, Address, and Telephone Number)*
Jeffrey Campolongo, Law Office of Jeffrey Campolongo, 300 Conshohocken St Rd., Ste 180, Bala Cynwyd PA 19004, (484) 434-8930

Attorneys *(If Known)*

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
       Plaintiff

☒ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 2  U.S. Government
       Defendant

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                                  *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☒ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
       Proceeding

☐ 2  Removed from
       State Court

☐ 3  Remanded from
       Appellate Court

☐ 4  Reinstated or
       Reopened

☐ 5  Transferred from
       Another District
       *(specify)*

☐ 6  Multidistrict
       Litigation -
       Transfer

☐ 8  Multidistrict
       Litigation -
       Direct File

## VI.  CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
ERISA, 29 U.S.C. § 1001, et. seq.

Brief description of cause:
Long term disability denial

## VII.  REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
>$150,000

CHECK YES only if demanded in complaint:
JURY DEMAND:      ☐ Yes   ☒ No

## VIII.  RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
September 27, 2021

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Clifford Torban | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| The Lincoln National Life | : | NO. |
| Insurance Co. | | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court.  (See reverse side of this form for a detailed explanation of special
management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.      (X )

| | | |
|---|---|---|
| September 27, 2021 | | Jeffrey Campolongo, Esquire |
| **Date** | **Attorney-at-law** | **Attorney for** Plaintiff |
| 484-434-8930 | 484-434-8931 | jcamp@jcamplaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: Clifford Torban, 1 Aldrich Way, West Windsor NJ 08550

Address of Defendant: The Lincoln Nat. Life Ins. Co., 8801 Indian Hills Drive, Omaha, NE 68114-4066

Place of Accident, Incident or Transaction: E.D.PA

---

**RELATED CASE, IF ANY:**

Case Number: N/A          Judge: _____          Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?          Yes ☐   No ✔

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?          Yes ☐   No ✔

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?          Yes ☐   No ✔

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?          Yes ☐   No ✔

I certify that, to my knowledge, the within case ☐ is / ■ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: September 27, 2021          _____          82608
                                  *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.   Federal Question Cases:**

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ✔ 11. All other Federal Question Cases
     *(Please specify):* ERISA, 29 U.S.C. § 1001, et. seq.

**B.   Diversity Jurisdiction Cases:**

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
     *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, Jeffrey Campolongo , counsel of record *or* pro se plaintiff, do hereby certify:

- ☐ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ✔ Relief other than monetary damages is sought.

DATE: September 27, 2021          _____          82608
                                  *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

LAW OFFICE OF JEFFREY CAMPOLONGO         COUNSEL FOR PLAINTIFF
BY: JEFFREY CAMPOLONGO, ESQUIRE
IDENTIFICATION NO: 82608
300 CONSHOHOCKEN STATE ROAD, SUITE 180
WEST CONSHOHOCKEN, PA 19428
484.434.8930
484.434.8931 (FAX)
JCAMP@JCAMPLAW.COM
WWW.JCAMPLAW.COM

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CLIFFORD TORBAN | : | |
| 1 ALDRICH WAY | : | |
| WEST WINDSOR NJ 08550 | : | CIVIL ACTION |
|    Plaintiff, | : | |
| | : | |
|    v. | : | |
| | : | |
| THE LINCOLN NATIONAL | : | |
|   LIFE INSURANCE CO. | : | |
| 8801 INDIAN HILLS DRIVE | : | |
| OMAHA, NE 68114-4066 | : | |
|    Defendant, | : | |
| | : | |

**COMPLAINT**

## I.    INTRODUCTION AND SUMMARY

Clifford Torban files this action against Defendant The Lincoln National Life Insurance Co. in order to overturn a denial of long-term disability insurance benefits secured through a group insurance policy issued to Mr. Torban's former employer, American Brokerage Services, Inc. This matter is brought pursuant to the Employee Retirement Income Security Program ("ERISA"), 29 U.S.C. § 1001, *et. seq*.

## II.    PARTIES

1.    Plaintiff, Clifford Torban (hereinafter referred to as "Mr. Torban"), is an adult male who resides at the above captioned address.

2.    At all times material hereto, Mr. Torban was an employee of American Brokerage

1

Services, Inc. ("ABS").

3.  Defendant The Lincoln National Life Insurance Co. (hereinafter referred to as "Lincoln Financial") is an insurance company that provides long term disability insurance benefits to amongst others, employees of ABS. Lincoln Financial maintains a service office at the above captioned address, and principal place of business at 1301 S. Harrison St, Fort Wayne, IN 46807.

## III.   **JURISDICTION and VENUE**

4.  Plaintiff incorporates by reference the previous paragraphs as if the same were set forth more fully at length herein.

5.  The jurisdiction of this Court is based upon 28 U.S.C. § 1331, in that this Court has original jurisdiction of this matter which is based upon a law of the United States of America, the Employee Retirement Income Security Program ("ERISA"), 29 U.S.C. § 1001, *et. seq*. This Court also has a specific grant of jurisdiction over this matter as provided by 29 U.S.C. § 1132(a)(1)(B).

6.  Venue is appropriate in this Court pursuant to 28 U.S.C. § 1392(b) in that the Defendant has ongoing business operations in this District, Plaintiff was employed in this District and a substantial part of the events giving rise to the claim occurred in this District.

7.  Over the course of Plaintiff's lifetime, it is believed and averred that the amount in controversy exceeds $150,000.00, exclusive of interest and costs.

## IV.   **FACTUAL ALLEGATIONS**

8.  Plaintiff incorporates by reference the previous paragraphs as if the same were set forth more fully at length herein.

### A.   **Mr. Torban's Employment with ABS**

9.   Mr. Torban was employed with American Brokerage Services ("ABS") since March

25, 2002.

10. At the time of his termination from ABS in May 2018, Mr. Torban was employed as the General Manager of Annuity Sales.

11. In this role, Mr. Torban's job responsibilities included presentations, distribution and sale of annuity products to licensed agents.

12. At all times material hereto, Mr. Torban's duties were performed from the ABS office, through telephone sales, with occasional travel to meet with insurance agents.

13. Mr. Torban's role also required management of junior annuity representatives, which could be done largely via telephone and/or email and/or remote communications.

14. The essential functions of Mr. Torban's job were capable of being performed remotely.

15. In fact, prior to November 2017, Mr. Torban frequently performed the essential functions of his job remotely.

16. On November 30, 2017, Mr. Torban worked from home, before going to Temple University Hospital for a medical procedure.

17. On December 4, 2017, Mr. Torban underwent Cardiac Thoracic Surgery. The surgery consisted of pump Coronary Artery Bypass Grafting X4, commonly referred to as a quadruple bypass surgery.

18. Mr. Torban's post-operative course was complicated by a severe allergic reaction to Heparin, a prescription drug administered to him in the hospital.

19. The allergic reaction caused Mr. Torban to form blood clots, instead of the drug's intended purpose of preventing blood clots.

20. This allergic reaction is known as Heparin-induced thrombocytopenia, with associated deep vein thrombosis and pulmonary embolism, and is commonly referred to as "HIT II."

21. As a result of these complications, Mr. Torban was not discharged from the hospital

to go home until December 22, 2017.

22. To date, Mr. Torban continues to have a physical condition which substantially limits one or more major life activities.  Specifically, Mr. Torban has Coronary Artery Disease and requires close supervision of blood levels due to long-term Coumadin therapy to prevent blood clotting, deep vein thrombosis and pulmonary embolism.

23. Mr. Torban started a course of cardiac rehabilitation in March 2018.

24. During this time, Mr. Torban was on an approved medical leave of absence from work under the Family and Medical Leave Act.

25. Throughout his medical leave of absence, Mr. Torban remained in communication with his managers and co-workers at ABS about his status and intention to return to work.

26. ABS asked Mr. Torban when he was going to return to work, and told him that ABS needed to make room for Mr. Torban's replacement if he was not returning in short order.

27. After conferring with his treating physician about returning to work, Mr. Torban's doctor was specifically concerned about Mr. Torban driving for long periods of time, due to the potential for intermittent, sudden fatigue, and blood clotting concerns, all due to Mr. Torban's disability and the medications prescribed to him, including Coumadin.

28. On December 26, 2018, Mr. Torban's physician provided a note stating: "It is my understanding that Mr. Torban's return to work would require an unusually excessive compute [sic].  This would put him at increased risk for a future DVT.  Additionally, if this compute [sic] is such that he would not be able to stop at rest areas and exercise his legs by walking, this adds to the risk."

29. In or around February 2018, citing these concerns and the 100-mile/2-hour (minimum)

driving commute, Mr. Torban requested to work from home. On several separate occasions in conversations with Steve Delaney, one of the principals of ABS, Mr. Torban requested the ability to work from home when he returned. Each of Mr. Torban's requests was denied.

30.   ABS responded that Mr. Torban could not work from home, although Mr. Delaney suggested that Mr. Torban work in the office two or three days per week, while being out on "disability" the remainder of the week.

31.   In or around April 2018, Mr. Torban advised ABS that it was his intention to return to ABS after he completed his cardiac rehabilitation.

32.   On April 24, 2018, Mr. Torban's physician wrote to Dan Dubyk, one of the principals at ABS and indicated that Mr. Torban hoped to return to work on June 4, 2018.

33.   On May 8, 2018, Mr. Torban advised ABS that his disability leave would need to be extended to at least June 8, 2018 due to concerns that his cardiologist had regarding his long commute to work and the increased risk of a blood clot.

34.   In a note dated May 23, 2018, Mr. Torban's physician recommended that Mr. Torban remain on disability leave and restrain from lengthy car rides that may result in him sitting for long periods of time.

35.   Mr. Torban was capable of performing the essential functions of the job, with an accommodation to work from home, or possibly another, reasonable accommodation.

36.   ABS failed and refused to even consider whether the essential functions of Mr. Torban's job required his presence on-site in their office, or whether there was any other reasonable accommodation it could make to accommodate Mr. Torban's disability.

37.   ABS terminated Mr. Torban's employment on or about May 31, 2018.

**B.**   **Mr. Torban's Short-Term Disability Claim is Approved by Lincoln Financial**

38.   At all times material hereto, Mr. Torban was a beneficiary of the short-term disability plan ("STD") issued to ABS by Defendant Lincoln Financial.

39.   On or about December 14, 2017, ABS notified Defendant Lincoln Financial of Mr. Torban's claim, writing: "Please find attached Employer Short Term Disability Statement for employee Cliff Torban. Cliff is our annuity sales manager and is a salaried employee. His last day of work was on 11/30/17 and his PTO was exhausted on 12/11/17."

40.   On January 5, 2018, Defendant Lincoln Financial approved Mr. Torban's STD claim beginning on December 4, 2017.

41.   Mr. Torban's STD claim was approved through June 8, 2018.

42.   On May 23, 2018, Defendant Lincoln Financial "Recommend rolling [Mr. Torban] to LTD."

43.   On June 1, 2018, Defendant Lincoln Financial notified ABS that "It looks like he will be approved" for LTD benefits.

**C.**   **Mr. Torban's Long-Term Disability Claim is Approved by Lincoln Financial**

44.   At all times material hereto, Mr. Torban was a beneficiary of the long-term disability plan ("LTD") issued to ABS by Defendant Lincoln Financial.

45.   On July 3, 2018, Defendant Lincoln Financial wrote to Mr. Torban to advise: "This letter is to advise your claim for Long Term Disability benefits has been approved. The policy does have a 180 day elimination period during which no benefits are payable. After satisfaction of this elimination period, benefits for your claim would begin on 05/29/2018. Your first benefit payment will be issued on 07/03/2018 and will

6

cover the period of disability from 05/29/2018 to 06/29/2018."

46.     The LTD policy provided 36 months of benefits "as long as you are unable to perform
        the main duties of your Own Occupation, as defined in the policy."

47.     On October 1, 2018, Defendant Lincoln Financial advised Mr. Torban by letter that
        "the medical information does not provide clinical evidence that would support
        restrictions and limitations to preclude you from returning to your own occupation.
        Benefits have been paid to 09/27/2018 but no additional benefits can be assessed until
        additional information is received."

48.     On October 29, 2018, Defendant sent a letter to Mr. Torban stating: "We have
        completed our review of your Long Term Disability claim and have determined that
        no additional benefits are payable beyond 09/29/2018."

49.     On November 11, 2018, Mr. Torban was sent a letter from Defendant Lincoln
        Financial reiterating its denial of Mr. Torban's ongoing LTD claim.

50.     Mr. Torban timely appealed the termination of his benefits in a letter dated November
        23, 2018.

51.     Defendant Lincoln Financial acknowledged receipt of Mr. Torban's appeal in a letter
        dated December 3, 2018.

52.     On January 31, 2019, Defendant Lincoln Financial advised Mr. Torban that the
        appeal decision was not yet completed, and he had 21 days to submit additional
        medical documentation.

53.     On February 21, 2019, Mr. Torban sent a letter, through his counsel, to Defendant
        Lincoln Financial to request all records pertaining to Mr. Torban's LTD application
        and denial.

54.     By letter dated March 11, 2019, Defendant Lincoln Financial notified Mr. Torban that
        it completed the review of his LTD claim and the company was "unable to approve

7

benefits beyond 09/29/2018."

**D.    Mr. Torban's Next Level Appeal**

55.    As a result of the determination on March 11, 2019, Mr. Torban, through counsel, timely filed his next level appeal on September 6, 2019 within 180 days.

56.    According to Mr. Torban's group insurance policy for American Brokerage Services, an employee is totally disabled if, "During the Elimination Period and Own Occupation Period . . . due to an Injury or Sickness the Insured Employee is unable to perform all of the Main Duties of his or her Own Occupation." Main Duties are those "job tasks that: 1. are normally required to perform the Insured Employee's Own Occupation; and 2. Could not reasonably be modified or omitted."

57.    Therefore, in order to receive LTD benefits under The Lincoln National Life Insurance Co.'s (Lincoln's) policy, Mr. Torban must have sufficient findings to support his inability to perform all of the main duties of his position with American Brokerage Services (ABS).

58.    In the denial letter, Lincoln stated that Mr. Torban has not satisfied the policy's definition of Total Disability. This decision was based upon the review of Mr. Torban's medical file performed by Dr. Gary Greenhood, at Lincoln's request. Dr. Greenhood's analysis found that Mr. Torban should be able to work in his own occupation if he was solely in a home-exercise program.

59.    As part of the appeals process, a second review of Mr. Torban's medical file was performed by Dr. Robert Bryg, again at Lincoln's request. Dr. Byrg's analysis found that "[t]here are no cardiovascular functional impairments." Both reviews found Mr. Torban to be capable of performing the main duties of his on-site sedentary position.

60.    Mr. Torban's cardiologist, Dr. John Mercuro, provided substantial documentation of Mr. Torban's ongoing symptoms and objective pathology.

61.     Furthermore, Dr. Mercuro provided clinical findings to support the conclusion that Mr. Torban meets Lincoln's definition of Total Disability under the above-stated policy and cannot perform the duties of an on-site sedentary occupation after December 1, 2017 and on an ongoing basis.

62.     Mr. Torban's next level appealed stated the following:

### Mr. Torban's Main Duties at ABS

Mr. Torban has worked for ABS since March 25, 2002 and was employed as the General Manager of Annuity Sales when he became disabled in November, 2017. According to ABS, Mr. Torban's position involved presentation, distribution, and sale of annuity products to licensed agents. These tasks are performed from ABS's office through telephone sales. A Job Analysis Form, provided by Lincoln and completed by ABS in June 2018, noted that Mr. Torban's position involves sitting continuously but did not indicate whether the job could be modified to accommodate Mr. Torban's disability. Lincoln requested an occupational analysis, which indicated that the position is sedentary and involves mostly sitting.

Mr. Torban requested that he be permitted to work remotely, an accommodation that would have allowed him to avoid the long commute and continuous sitting that increases his risk of DVT. However, ABS denied his accommodation request, indicating that his main duties must be completed on-site in their office. See attached EEOC Charge. Mr. Torban's main duties therefore involve on-site sedentary work. Mr. Torban is totally disabled under Lincoln's LTD policy if he is unable to complete his on-site, sedentary tasks.

### Dr. John Mercuro – Records from 11/28/2017 through 7/29/2019

Dr. John Mercuro began treating Mr. Torban on November 28, 2017, when Mr. Torban presented with shortness of breath with minimal exertion and an electrocardiogram suggestive of chronic ischemia. An echocardiogram performed on November 29, 2017 was abnormal, revealing moderate left ventricular systolic dysfunction suggestive of ischemic heart disease and a mildly dilated right atrium suggestive of hypertensive heart disease. On November 30, 2017, a diagnostic cardiac catherization documented severe native coronary artery disease including the LAD/diagonal branches/OMI/midCX.

Mr. Torban underwent a Coronary Artery Bypass Graft X4 surgery (CABG) due to severe triple vessel disease at Temple University Hospital on December 4, 2017. His recovery was complicated by worsening platelet, pulmonary emboli, acute hypoxic respiratory failure, and thrombocytopenia. Furthermore, Mr. Torban suffered a severe allergic reaction to Heparin, a prescription drug administered to him in the hospital, which caused him to

form blood clots instead of the drug's intended purpose of preventing blood clots. The allergic reaction is known as Heparin-induced thrombocytopenia, with associated deep vein thrombosis (DVT) and pulmonary embolism, and is commonly referred to as "HIT II." These complications extended Mr. Torban's hospital stay, and he was not discharged until December 22, 2017.

Mr. Torban was unable to begin cardiac rehabilitation until January 31, 2018 due to the severity of his condition and his lengthy hospital stay, which caused deconditioning. At an office visit with Dr. Mercuro on January 8, 2018, Dr. Mercuro noted functional mild mitral regurgitation and essential hypertension. On the next office visit on February 5, 2018, Dr. Mercuro noted that Mr. Torban's ECG was positive for ischemia and there was evidence of disease involving the mid anterior wall and proximal anterior septum. He also noted that Mr. Torban could walk six blocks and climb two flights of stairs and that Mr. Torban experienced no shortness of breath with mild exertion; however, Mr. Torban remained on Coumadin because of his risk for DVT.

Dr. Mercuro's notes from Mr. Torban's subsequent visits on April 16, June 18, August 22, and October 23, 2018 are consistent and show no change to Mr. Torban's status. The ECG's at each visit demonstrated normal sinus rhythm, interatrial conduction delay, and nonspecific ST-T changes with no acute change. Mr. Torban maintained his cardiac rehabilitation regimen and progressed to Phase III by his office visit on June 18, 2018. However, Mr. Torban remained and continues to remain at risk for DVT, a life-threatening condition, despite long-term Coumadin therapy.

Mr. Torban's risk of DVT is heightened by sedentary activities, such as driving long distances or sitting for long periods of time, rather than by cardiovascular exercise. Dr. Mercuro recommended that Mr. Torban refrain from lengthy car rides and from remaining seated for more than two hours at a time in order to manage his risk of DVT. In fact, in the Abilities Form requested by Lincoln and dated October 24, 2018, Dr. Mercuro noted that Mr. Torban may sit, stand, walk, and drive "occasionally" and required "close supervision of blood levels due to long-term Coumadin therapy R/T DVT and PE."

Dr. Mercuro recommended that Mr. Torban remain on disability in a letter to Lincoln dated May 23, 2018 due to his risk of DVT, which would be heightened by his long commute and sedentary position. Lincoln evidently agreed with Dr. Mercuro's analysis, because Mr. Torban's short-term disability benefits were rolled over to LTD benefits on July 3, 2018 based on notes from Mr. Torban's June 22, 2108 visit. In fact, Lincoln's clinical roundtable recommended that Mr. Torban remain on LTD at least until his next appointment and "while in cardiac rehab." However, Mr. Torban's LTD benefits were denied after Mr. Torban's next visit with Dr. Mercuro in August 2018, even though Mr. Torban's condition had not changed and he remained in cardiac rehabilitation.

On July 29, 2019, Dr. Mercuro provided an updated report on Mr.

Torban's cardiovascular situation.  See attached.  Mr. Torban follows up with Dr. Mercuro once per month and requires ongoing medical management and risk factor modification.   Dr. Mercuro remains concerned of risk factors associated with Deep Venous Thrombosis.  Based on a recent publication from NCBI Bookshelf: A service of the National Library of Medicine, National Institute of Health, published in January 2019 and updated in March 2019, Mr. Torban's risk factors include age, long-distance travel, prior venous thromboembolism, and recent surgery. Also, men are at higher risk of recurrent DVT's than women. Dr. Mercuro recommended that Mr. Torban **not** return to work at this time given the fact that he would be subject to a long daily commute and potential for long periods of inactivity.

Clearly, Mr. Torban's inability to drive long distances precludes him from being on-site as required by ABS. Furthermore, his inability to sit for long periods of time means that he cannot perform the sedentary duties of his position, which require sitting for long periods of time. Because Mr. Torban's main duties require sedentary work performed on-site, and Mr. Torban's potentially life-threatening risk of DVT precludes him from physically being in the office and sitting at a desk all day, Mr. Torban was and continues to be totally disabled under Lincoln's LTD policy.

### *Peer Review Completed by Dr. Gary Greenhood on October 8, 2018*

Continuation of Mr. Torban's LTD benefits was initially denied based on a review of Mr. Torban's medical records by Dr. Gary Greenhood, who never personally examined Mr Torban. Dr. Greenhood reviewed Dr. Mercuro's notes—incorrectly identified in Lincoln's Chronological Activity List as notes from Dr. Douglas Shoenber, Mr. Torban's primary care physician—after Mr. Torban's visit with Dr. Mercuro on August 22, 2018. Dr. Mercuro's notes from the August visit were consistent with the notes from Mr. Torban's prior visit on June 18, 2018 and showed no improvement of Mr. Torban's condition. After the June visit, Lincoln's clinical review of Dr. Mercuro's notes recommended that Mr. Torban remain out of work "while in cardiac rehab." Though there was no difference between Dr. Mercuro's notes regarding Mr. Torban's office visits in June and August, Dr. Greenhood nonetheless concluded that Mr. Torban should be able to work in his own occupation based on the August 22, 2018 visit.

Dr. Greenhood seems to base his conclusion solely on the fact that Mr. Torban was in Phase III of his cardiac rehabilitation, stating "[i]f this claimant is currently only in a home-exercise program then he should be able to work in his own occupation unless information is presented re: ongoing angina pectoris, shortness of breath at rest, a depressed ejection fraction, arrhythmia, pulmonary function deficits, etc." Dr. Greenhood's cursory analysis did not even address Mr. Torban's unique and ongoing risk of DVT caused by an allergic reaction to Heparin. Instead, he focused on standard post-CABG complications not relevant to Mr. Torban's disability as well as Mr. Torban's ability to complete cardiovascular exercise after his surgery. However, it is not

11

exercise but remaining sedentary that increases Mr. Torban's risk of DVT and life-threatening pulmonary embolism.

Mr. Torban's ability to complete his main duties cannot be determined by his ability to exercise (which can actually help prevent DVT), because Mr. Torban's main duties do not involve active tasks. Rather, Mr. Torban's ability to complete his main duties must be determined by his ability to complete his sedentary job tasks on-site. A thorough review of Mr. Torban's medical history shows that Mr. Torban's risk of DVT prevents him from being able to complete the on-site, sedentary main duties of his job.

### ***Peer Review Completed by Dr. Robert Bryg on January 21, 2019***

A second peer review of Mr. Torban's medical records was completed by Dr. Robert Bryg at Lincoln's request on January 21, 2019 as part of the LTD appeals process. Like Dr. Greenhood, Dr. Bryg did not personally examine Mr. Torban but nonetheless concluded that Mr. Torban was able return to work. Also like Dr. Greenhood, Dr. Bryg's analysis focused on Mr. Torban's ability to complete cardiovascular exercise. He notes that Mr. Torban would have no limitations precluding his return to work because "[t]here are no cardiovascular functional impairments" and Mr. Torban can walk one mile and climb two flights of stairs. Again, however, Mr. Torban's ability to complete his sedentary tasks on-site as required by ABS cannot be determined by his cardiovascular exercise capacity, but by his ability to remain sedentary for long periods of time. The medical records do not support an ability to remain sedentary. In fact, the medical records clearly indicate that remaining sedentary for long periods, such as in a car or at a desk, increases Mr. Torban's risk of DVT and life-threatening pulmonary embolism.

Dr. Bryg further claims that the restrictions placed by Dr. Mercuro are more restrictive than is supported by the medical records because Mr. Torban has healed from his CABG. Dr. Bryg notes that there are generally no restrictions from a cardiac standpoint after the surgery by this time in the recovery process. While this may be true, it is not Mr. Torban's recovery from CABG that is at issue in determining whether he qualifies as Totally Disabled under Lincoln's LTD policy. Rather, it is whether Mr. Torban's risk of DVT makes him unable to complete the sedentary, on-site main duties of his position.

Dr. Bryg does briefly address Mr. Torban's DVT, stating that "[h]is DVT is related to his surgery and would not preclude his return to work." However, Dr. Bryg does not present any explanation as to why Mr. Torban's continued risk of DVT would not preclude his return to work even though that is the inquiry central to Mr. Torban's appeal. As stated above, Dr. Bryg's conclusion is in direct conflict with Dr. Mercuro's continued recommendations as well as Mr. Torban's medical records.

Mr. Torban has clearly met Lincoln's definition of Total Disability, which defines disability as "During the Elimination Period and Own Occupation

Period . . . due to an Injury or Sickness the Insured Employee is unable to perform all of the Main Duties of his or her Own Occupation." Kindly reconsider Lincoln's decision to deny LTD to Mr. Torban. A contrary result would have a devastation impact on Mr. Torban.

63. On October 1, 2019, Defendant Lincoln Financial sent a letter to Mr. Torban requesting additional information.

64. On November 12, 2019, Mr. Torban sent the following letter, through his counsel, which read in pertinent part:

> Dear Ms. Kurtz:
>
> I am writing in response to your correspondence dated October 1, 2019. I wish to provide the following additional materials in support of Mr. Torban's appeal:
>
> - October 22, 2019 letter from T. John Mercuro, M.D., F.A.C.C.; and
> - November 12, 2019 vocational report from Gary A. Young, M.Ed., CRC, CDMS, CCM, ABVE/D.
>
> The foregoing records, in addition to the records previously submitted, more than sufficiently establish that Mr. Torban meets Lincoln Financial's definition of Total Disability. As discussed by Dr. Mercuro:
>
> The response from Lynn S., Nurse Disability Consultant II, Lincoln Financial Group indicated that there was only an increased risk of DVT after 6 hours of continuous travel. She also indicated that he should get up and walk at least every 2 hours if possible. Clearly, given the nature of his commute this is not a viable option.
>
> Furthermore, the Nurse Disability Consultant completely ignored the treating cardiologist's list of risk factors associated with deep venous thrombosis, of which Mr. Torban's risk factors include age, long-distance travel, prior venous thromboembolism, and recent surgery. Also men are at higher risk of recurrent DVT's than women. The Nurse Consultant conveniently focused on merely one risk factor (i.e. travel), as opposed to evaluating four additional risk factors. This constitutes a failure on the part of the carrier to have a reasonable basis for denying benefits under the explicit terms of the policy.

13

In addition, the expert vocational report of Mr. Young, attached hereto, makes clear that Mr. Torban meets the policy's definition of disability by virtue of the fact that he is precluded from performing the main duties, i.e., essential functions, of his job as the General Manager of Annuity Sales.  As states in the language in the policy itself:

**MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES** means those job tasks that:
1. are normally required to perform the Insured Employee's Own Occupation; and
2. could not reasonably be modified or omitted.
To determine whether a job task could reasonably be modified or omitted, the Company will apply the Americans with Disabilities Act's standards concerning reasonable accommodation. It will apply the Act's standards, whether or not:
1. the Employer is subject to the Act; or
2. the Insured Employee has requested such a job accommodation.
An Employer's failure to modify or omit other job tasks does not render the Insured Employee unable to perform the Main Duties of the job.
Main Duties include those job tasks:
1. as described in the U.S. Department of Labor Dictionary of Occupational Titles; and
2. as performed in the general labor market and national economy.
Main Duties are not limited to those specific job tasks as performed for a certain firm or at a certain work site.

Mr. Torban requested that he be permitted to work remotely, an accommodation that would have allowed him to avoid the long commute and continuous sitting that increases his risk of DVT.  According to Mr. Young's expert report: "American Brokerage Services has decided that arriving and working out of the office is an Essential Function to the position that Mr. Torban held at the time of employment. If he is not capable of traveling to and from the office site, they have stated that he is no longer employable with that company."

This point is worth restating.  If the employer has deemed a task to be a main duty, as in reporting to the office on a daily basis, and Mr. Torban is unable to do so, then by definition it means he is unable to perform the main duties of the job.  As opined by Mr. Young: "Whether the requirement to work daily from the office is truly an Essential Function is not a debatable point. It is up to the employer to determine those issues and if it is believed by Mr. Torban that this is not an Essential Function,

he has rights under the Americans with Disabilities Act to dispute this and seek compensation. But at this stage, this assessment is not up for debate."

Finally, it is evident that Lincoln has intentionally misrepresented the language in its own insurance policy as it relates to the possibility of Mr. Torban returning to work with another employer. The policy has a provision for partial disability/vocational rehabilitation, none of which have been provided to Mr. Torban:

**PARTIAL DISABILITY and VOCATIONAL REHABILITATION**
The policy contains a partial disability monthly benefit provision. If you become capable of working on a part-time basis, you may still be entitled to a monthly benefit. Please notify our office immediately if your disability status changes and we will determine your eligibility for partial disability benefits.
The policy contains a vocational rehabilitation benefit for which you may be eligible. Vocational Rehabilitation consists of services, which may include:
- vocational evaluation, counseling, training or job placement
- job modification or special equipment
- other services The Lincoln National Life Insurance Company feels are reasonably necessary to help you return to work
  You, your physician or The Lincoln National Life Insurance Company can propose vocational rehabilitation. You may be contacted in the future to determine your rehabilitation needs and goals.

Lincoln Financial did not provide any vocational rehabilitation services to Mr. Torban.  Mr. Young has opined that "it would be reasonable to consider the vocational rehabilitation Procedures and Services That Were Available through Lincoln Financial. There were no services provided. There was a note in the file indicating that Mr. Torban's past work is consistent with the job description contained in the Dictionary of Occupational Titles. . . .For this reason, Mr. Torban is not employable either in this industry or with a particular employer American Brokerage Services."

65.    On November 21, 2019, Defendant Lincoln Financial issued its final denial letter

denying Mr. Torban's ongoing claim for LTD benefits.

66.     A true and correct copy of the final denial letter is attached hereto as Exhibit A.

**COUNT I**
**CLAIM FOR BENEFITS**
**29 U.S.C. Section 1132(a)(1)(B)**

67.     Plaintiff incorporates the foregoing paragraphs of the complaint as though fully set forth herein.

68.     Plaintiff was a participant in the Lincoln Financial Plan that provides long-term disability benefits.

69.     At all times from May 29, 2018 to present Plaintiff has been totally disabled within the meaning of the Lincoln Financial Plan.

70.     Plaintiff has been denied continuing long-term disability benefits under the Lincoln Financial Plan.

71.     Plaintiff has exhausted all administrative remedies under the Plan.

72.     Lincoln Financial's termination of Plaintiff's claim for long-term disability benefits was made in an arbitrary and capricious fashion.

73.     Plaintiff has been unfairly prejudiced, delayed and wrongfully denied the right to recover long-term disability benefits under the terms of the Lincoln Financial Plan which is subject to jurisdiction under ERISA.

74.     By denying Plaintiff long-term disability benefits Lincoln Financial has violated 29 U.S.C. § 1132 (a)(1)(B).

**WHEREFORE**, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendant Lincoln Financial and that this Court (1) enter an Order clarifying Plaintiff's rights to all past, present and future long-term disability benefits due; and (2) awarding Plaintiff (a) all past, present and future long-term disability benefits due, (b) prejudgment interest, (c) reasonable attorneys' fees costs and costs, and (d) all other legal and equitable relief that the Court deems appropriate.

**RESPECTFULLY SUBMITTED,**

September 27, 2021             **By:**   [JC3646 - Validation of Signature Code]
Date                                  Jeffrey Campolongo, Esquire
                                      **LAW OFFICE OF JEFFREY CAMPOLONGO**
                                      300 Conshohocken State Road
                                      Suite 180
                                      West Conshohocken PA 19428
                                      484-434-8930
                                      484-434-8931 fax
                                      **jcamp@jcamplaw.com**

                                      ***Counsel for Plaintiff***

# Exhibit A



Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.

**The Lincoln National Life**
**Insurance Company**
Service Office:
PO Box 2609
Omaha, NE 68103-2609
Toll free (800) 423-2765
Toll free Fax (877) 843-3950
www.Lincoln4benefits.com

November 21, 2019

LAW OFFICE OF JEFFREY CAMPOLONGO
ATTN JEFFREY CAMPOLONGO
50 MONUMENT ROAD
SUITE 101
BALA CYNWYD, PA 19004

Re:     Policyholder: American Brokerage Services
        Policy Number: 00094021401700000
        Claim Number: 1180054110
        Claimant: Clifford Torban

Dear Mr. Campolongo:

We have completed our review of your client's Long Term Disability appeal.  Based on the information provided, we have determined that we are unable to approve benefits beyond 09/29/2018. In our appeal review process, all information previously submitted as well as any new documentation was used to make a determination.

To qualify for benefits under the policy issued to your client's employer, an individual must satisfy all of the provisions of the policy.  This includes, but is not limited to, the following:

**TOTAL DISABILITY** or **TOTALLY DISABLED** will be defined as follows:
1.   During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform all of the Main Duties of his or her Own Occupation.
2.   After the Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee is unable to perform all of the Main Duties of any occupation which his or her training, education, experience, or physical or mental capacity will reasonably allow.
The loss of a professional license, an occupational license or certification, or a driver's license for any reason does **not**, by itself, constitute Total Disability.

©2019  Lincoln National Corporation www.lincoln4benefits.com
Lincoln Financial Group is the marketing name for Lincoln National Corporation and its affiliates.
Affiliates are separately responsible for their own financial and contractual obligations.

**OWN OCCUPATION or REGULAR OCCUPATION** means the occupation, trade or profession:

> 1.　　in which the Insured Employee was employed with the Employer prior to Disability; and
> 2.　　which was his or her main source of earned income prior to Disability.

It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles.　It includes any work in the same occupation for pay or profit, regardless of:

> 1.　　whether such work is with the Employer, with some other firm, or on a self-employed basis; or
> 2.　whether a suitable opening is currently available with the Employer or in the local labor market.

**MAIN DUTIES** or **MATERIAL AND SUBSTANTIAL DUTIES** means those job tasks that:

> 1.　are normally required to perform the Insured Employee's Own Occupation; and
> 2.　could not reasonably be modified or omitted.

To determine whether a job task could reasonably be modified or omitted, the Company will apply the Americans with Disabilities Act's standards concerning reasonable accommodation.　It will apply the Act's standards, whether or not:

> 1.　the Employer is subject to the Act; or
> 2.　the Insured Employee has requested such a job accommodation.

An Employer's failure to modify or omit other job tasks does **not** render the Insured Employee unable to perform the Main Duties of the job.

Main Duties include those job tasks:

> 1.　as described in the U.S. Department of Labor Dictionary of Occupational Titles; and
> 2.　as performed in the general labor market and national economy.

Main Duties are **not** limited to those specific job tasks as performed for a certain firm or at a certain work site.

## Vocational Summary

Based on information obtained from your client's employer, occupational information contained within the *Dictionary of Occupational Titles* (DOT), and evaluation from vocational professionals, we have determined that your client's occupation > is best defined as a MANAGER, BROKERAGE OFFICE (financial) alternate in the national workforce.　The material and substantial duties of a MANAGER, BROKERAGE OFFICE (financial) alternate include but are not limited to the following:

- Directs and coordinates activities concerned with buying or selling investment products and financial services, such as securities, insurance, and real estate, for clients of brokerage firm
- Screens, selects, and hires Registered Representative and other employees
- Direct in-service training to improve client services and increase sales volume
- Develops and implements plans to ensure compliance of workers with established programs, procedures, and practices
- Establishes internal control procedures to control margin accounts, short sales, and options and to reduce office errors and client complaints

- Reviews recapitulation of daily transactions to ensure accordance with rules and regulations of government agencies, regulatory bodies, and securities exchanges
- Analyzes operations to determine areas where cost reductions could be implemented or program improvements initiated
- Evaluated profitability of gross sales and transactions
- Conducts staff meetings of personnel to discuss changes in policy, redirection of sales emphasis to other programs, or to propose methods and procedures to increase firm's share of local market and trade volume
- Explains firm's research and customer service facilities and how use of facilities can promote customer relations and sales
- Prepares activity reports for evaluation by management

Regarding physical capacity, a MANAGER, BROKERAGE OFFICE (financial) alternate in the national workforce is a Sedentary physical capacity occupation.  The definition of Sedentary work is Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are only required occasionally (1-33%) and if all other sedentary criteria are met. Sedentary work may require exertion up to 10 lbs. occasionally and a negligible degree of exertion on a frequent (34-66%) or constant (67-100%) basis.

In order to be considered Totally Disabled, the medical documentation must support that your client is unable to perform each of the main duties of your client's own occupation.  As such, in considering whether your client qualifies for Long Term benefits beyond 09/29/2018, we evaluated whether your client would be restricted or limited from performing the main duties of your client's occupation as listed above.

Your client's entire file was reviewed upon appeal. Disability must be supported from 09/29/2018 forward, which was the focus of our determination.

## Summary of Initial Claim Filing

Your client's initial claim forms state that your client was unable to continue working in your client's own occupation beyond 11/29/2017 due to Atherosclerotic heart disease of native.

Benefits were approved from 05/29/2018 to 08/29/2018.  Benefits were not approved beyond 08/29/2018 after we determined your client is no longer Totally Disabled from performing the main duties of his or her occupation. Our evaluation included review of the medical documentation, including consultation with and/or review of a written report from Dr. Gary Greenhood, a physician who is Board Certified in Internal Medicine.  For complete details please refer to our letter dated 10/29/2018.

The letter noted in part, the following:

> Based on the medical records on file, there is insufficient clinical evidence to assess the presence and extent of a physical impairment due to your coronary artery bypass graft procedure.  Therefore, there is insufficient evidence that you would be unable to perform the Main Duties of your own occupation beyond 09/29/2018.

**Summary of First Level of Appeal**

On 11/26/2018, your client filed an appeal in response to our determination to terminate benefits. Our review of the medical documentation which included consultation with and/or review of a written report from Dr. Robert Bryg, an independent physician who is Board Certified in Cardiology, did not support that your client was unable to perform the main duties of his or her own occupation beyond 09/29/2018. For complete details please refer to our letter dated 03/11/2019.

Dr. Bryg's review noted, in part, the following:

> The claimant has CAD and is status post CABG in 11/17, He had a complication after the CABG with development of DVT and PE. He is on long term coumadin for his DVT. He is doing well with no chest pain or shortness of breath.

> There are no cardiovascular functional impairments from 9/28/18. He is now 10 months s/p CABG and can walk 1 mile and climb 2 flights of stairs. He would have no limitations precluding his return to work.

> The restrictions placed by the AP are more restrictive than is supported by the medical records. The claimant has CABG, but has healed from this. By this time, there are generally no restrictions from a cardiac standpoint after the surgery. His DVT is related to his surgery and would not preclude his return to work.

**Summary of Second Level of Appeal**

On 09/06/2019, your client filed their second and final appeal in response to our determination to uphold our previous decision to terminate benefits. Additional information was submitted with your client's appeal, including but not limited to a letter from Cardiologist, Dr. Mercuro dated 07/29/2019 and a NCBI Bookshelf publication regarding DVT.

As part of your client's appeal review, all current and new medical information was reviewed by a healthcare consultant. For details of these medical records please refer to the medical review that was sent to you on 10/01/2019. The report was sent to you to afford you the opportunity for you or your client's treating physician(s) to respond or offer a rebuttal.

The review noted, in part, the following:

> The medical records document cardiac history with bypass surgery, complications of DVT and PE, and recovery. Comorbid conditions of diabetes, hypertension and hypercholesterolemia are being well-managed in conjunction with EE's cardiac treatment, and do not present evidence of physical impairment. Examinations are normal. Serial EKG's show some consistent T-wave changes, however there are no new or acute changes. EE is participating in cardiac rehab stage III in May 2018. In August and October, the records indicate EE remains in cardiac rehab, and is walking approximately 6 city blocks, and can climb 2 flights of stairs. This equates to community distance mobility. EE's only complaint is daytime fatigue, not otherwise described or treated. EE is being treated with anti-platelet medications with no evidence of DVT or PE documented since hospitalization. The medical records do not provide evidence of cardiac or other

physical impairment that would support restrictions as written by Mercuro, MD, from 9/28/18 forward,  and most specifically restrictions upon commute to work, or restriction on sitting only occasionally, as EE could utilize support stockings, stand/walk every 2 hours, change position for comfort as needed, utilize a sit/stand work station, and make other arrangements for his commute so he may do leg exercises during the commute as needed.

In response, you submitted an opinion letter dated 11/12/2019 but offered no new medical evidence.

While we value Mr. Torban's treating physician's opinion regarding the risk factors associated with your client's condition, it must be stated that risk factors do not equal a disabling condition.

You further state that Mr. Torban's employer would not accommodate his request to work from home in order to avoid the long commute to work.  The occupation Mr. Torban performed does not require driving as a main duty as defined by the U.S. Department of Labor Dictionary of Occupation Titles.  If his employer requires his attendance in the office, this is specific to this employer and not as performed in the general labor market and national economy (see main duties definition above).

Mr. Torban does not meet the definition of Partial Disability or Vocational Rehabilitation as his medical records do not support disability.  He is fully capable of returning to work in his own occupation, whether that be with his prior employer or a new employer.  Again, his ability to travel long distance is not a considered a main duty of the occupation; and a sedentary occupation would allow for positional changes as needed.

## Second Level Appeal Decision

We understand that your client has been diagnosed with Atherosclerotic heart disease of native. However, our review of the medical documentation, which included consultation with and/or review of a written report from a health care consultant, does not support that your client was unable to perform the main duties of your client's own occupation beyond your client's day last paid.

We acknowledge that Mr. Torban underwent a cardiac catheterization on 11/30/2017 and subsequent coronary artery bypass graft (CABG) on 4 vessels on 12/04/2017.  His medical records indicate that he had a delayed recovery due to complications of heparin induced thrombocytopenia, including deep vein thrombosis (DVT) and pulmonary embolism.  He was started on long-term Coumadin therapy and has been followed closely.

Mr. Torban's cardiologist, Dr. T. John Mercuro noted in a letter dated 05/23/2018 that Mr. Torban was to continue with Phase 3 Cardiac rehabilitation and should restrain from lengthy car rides or car rides that may result in sitting in traffic for long periods of time and to not remain seated for more than 2 hours at a time, due to a risk of a possible blood clot.

In office visit notes from 06/18/2018 and 08/22/018, Dr. Mercuro notes that Mr. Torban is stable and continues in cardiac rehabilitation.  He has no chest pain, shortness of breath or any other cardiac complaints.  He does indicate that he has daytime fatigue.  His EKG was stable without acute changes. As of 10/23/2018 he continues to deny chest pain, shortness of breath, or palpitations; he can walk 6 blocks and climb two flights of stairs.  He has not

vocalized any side effects of his medication. His examination on this date showed normal heart sounds, no swelling or fluid retention and the EKG showed normal heart rhythm, with old changes similar to prior EKG's.

Dr. Mercuro provided an Abilities form dated 10/24/2018 indicating that Mr. Torban could lift/carry up to 20 pounds frequently; up to 35 pounds occasionally but never more than 35 pounds. He could frequently finger, handle, and operate foot controls. He can occasionally sit, stand, walk 6 blocks, bend, kneel, drive, and reach above the should but should never climb. Dr. Mercuro notes that Mr. Torban requires close supervision of blood levels due to long-term coumadin therapy for prevention of DVT and PE.

The medical evidence provided would not preclude Mr. Torban for performing the main duties of his own occupation as described in the U.S. Department of Labor Dictionary of Occupational Titles and as performed in the general labor market and national economy.

We therefore find that your client is no longer Totally Disabled under the terms of our policy.

We are aware that your client is receiving Social Security Retirement (SSRT); however, the awarding of SSRT does not affect the disability claim decision made under the Lincoln Financial Group policy.

We evaluated this claim by applying the provisions of the policy to the facts and opinions contained in the claim file. Other than what is set out in the policy, we did not rely upon any guidelines, internal rules, protocols, standards or other similar criteria in reaching this claim determination.

You and your client have exhausted all rights of appeal, and your client's administrative file is now closed.

If your client's plan is subject to ERISA, your client may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your client's local U.S. Department of Labor Office and your client's State insurance regulatory agency. In addition, your client has the right to pursue litigation and your client may request copies of records and other information relevant to the claim free of charge.

The employer's plan has a contractual limitations period of three years, which means that a lawsuit must be brought within three years after the date written proof of claim or proof of continued disability was required. The date on which the contractual limitations period expires for this claim is 09/29/2021.

Please contact me directly at the number listed below with any questions you may have or email us at LFGAppeals@lfg.com.


Sincerely,


Lisa Kurtz, HIA
800-423-2765 *7616
Specialist, Claims
Appeals Department – Claims Solutions Shared Services
The Lincoln National Life Insurance Company

Chinese (Simplified)

注意：如果您说普通话，可以选择免费语言支持服务。 请拨打 1-800-423-2765.


Chinese (Traditional)

注意：若您講國語，可使用我們的免費語言支援服務。 請致電 1-800-423-2765.


Tagalog

Pansinin: Kung nagsasalita ka ng Tagalog, mayroon kang magagamit na mga libreng serbisyo ng tulong sa wika. Tumawag sa 1-800-423-2765.


Spanish

Atención: si habla español, tenemos disponibles servicios de apoyo con el idioma sin costo para usted. Llame al 1-800-423-2765.


Navajo

DÍÍ BAA AKÓ NÍNÍZIN:  Díí bee yáníłti'go  Diné bizaad, saad bee áká'ánida'áwo'déé' t'áá jiik'eh, ná hólǫ́.  Koji' hódíílnih áǫįóóǫéą́ą́ǫąíę́ę.